**HEADNOTE:**     *Boston v. State*, No. 871, September 2016 Term

**MARYLAND WIRETAP ACT — WILLFUL INTERCEPTION OF TELEPHONE CALL — RECORDING OF TELEPHONE CALL BETWEEN INMATE AND THIRD PARTY ADDED TO CALL BY INITIAL RECIPIENT OF CALL WAS NOT WILLFUL INTERCEPTION AND THEREFORE WAS NOT A VIOLATION OF WIRETAP ACT.**

The day after victim was shot multiple times in the course of a home invasion, the appellant spoke on the telephone to his brother, who was incarcerated at the Baltimore County Detention Center. The brother placed the telephone call to his girlfriend. Before they could speak to each other, a pre-recorded announcement informed them that their call would be recorded. The brother and his girlfriend conversed, and during the call the brother asked his girlfriend to dial his brother (the appellant) into the call. She did so. In the portion of the call between the appellant and his brother, the appellant made incriminating remarks about the crimes against the victim. Immediately before trial, defense counsel orally moved *in limine* to keep the recorded telephone call out of evidence as having been obtained in violation of the Wiretap Act, because the call was recorded without the appellant's consent. The court denied the motion. The appellant was convicted of numerous crimes against the victim and after sentencing noted an appeal.

*Held*: Judgments affirmed. The Maryland Wiretap Act makes it illegal to willfully intercept a telephone conversation. In certain circumstances willful interception is legal, including if the parties to the telephone conversation consent to its being recorded. Under the Act, with some exceptions, a recording of a telephone conversation is not admissible in evidence if it was obtained in violation of the Act.

The appellant was not on the line when the pre-recorded announcement was played, so there was no evidence that when he was added to the call the appellant knew that the call was being recorded and implicitly consented by proceeding to speak. Even if the call was recorded without the appellant's consent, however, it only was recorded in violation of the Wiretap Act if it was "willfully intercepted." Willful in this context means intentional-purposeful. The appellant bore the burden to show that the Detention Center intercepted his telephone conversation with his brother willfully. He produced no evidence to show that the Detention Center had knowledge that a third party (the appellant) was added to the telephone call the appellant's brother made to his girlfriend, and that it therefore had the power or control over the call that would make the recording of the brother's conversation with the appellant willful. Absent proof that the recording was obtained in violation of the Act, the court properly denied the motion *in limine*.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 871

September Term, 2016

_____

JATWAN DERRICK BOSTON

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Graeff,
Alpert, Paul E.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.
_____

Filed: December 20, 2017

A jury in the Circuit Court for Baltimore County convicted Jatwan Derrick Boston of attempted first degree murder, armed robbery, first degree burglary, use of a firearm in a crime of violence, and illegal possession of a regulated firearm. The court imposed concurrent sentences of life in prison for attempted murder, five years for illegal possession of a firearm, and twenty years for the remaining crimes.

On appeal, Boston presents three questions, which we have reordered and slightly rephrased:

I.   Did the trial court err by admitting into evidence a recording of a telephone conversation between Boston and his brother?

II.  Did the trial court err by admitting into evidence a gun seized during Boston's arrest?

III. Did the trial court err by admitting into evidence a jacket that police saw at the crime scene but did not take into custody until days later?

We answer all three questions in the negative and shall affirm the judgments.

## FACTS AND PROCEEDINGS

At trial, the following facts were adduced.[1]

At around 10:00 p.m. on November 29, 2014, three masked men burst into Steven Matthews's house in Catonsville and attacked him. The assailants kicked in Matthews's

---

[1] The State called Steven Matthews, the victim; ten Baltimore County Police Department officers or detectives; three forensic witnesses employed by that police department (a tool mark examiner, a latent print examiner, and a forensic biologist); and one DNA expert employed by a private testing laboratory. It moved numerous documents and items into evidence. Boston did not testify or put on a defense case.

front door, pointed guns at him, and tied him up with an exercise band. They hit him with nearby objects and ransacked his house.

Five minutes after the three assailants entered, Boston entered the house as well. He was not wearing a mask, and Matthews recognized him from the neighborhood. Boston took some "petty stuff," like video game consoles, and then approached Matthews, put a gun "five inches" from his head, and pulled the trigger. The gun did not fire. Boston turned to one of the other men, later identified as David Grant, and said: "We got to kill [Matthews] because he seen my face." Grant, who was standing about six feet away from Matthews, fired his gun at Matthews. Although the bullet struck Matthews in the back of his head, Matthews managed to break free from the exercise band, get up, and go after Grant. As the two were "tussling . . . on the ground," Grant fired two more shots at Matthews's head. Matthews tried to protect his head with his hands, to no avail.

Grant got up from the ground, and the four men left with two televisions and the keys to Matthews's BMW X6. Still functional despite the attack, Matthews stayed on the floor, waiting for the assailants to leave. After "a couple of minutes," he walked outside to get help from a neighbor. He saw Boston, Grant, and a third assailant inside his BMW, seemingly about to drive off. The fourth assailant left in the car the assailants originally arrived in. When Boston saw Matthews, he and the third assailant jumped out of the car and attacked him. The three ended up on the ground, fighting. Boston called for Grant, who got out of the car with a gun, got close to the fighting men, and shot Matthews in the back of his arm. Matthews kicked the gun out of Grant's hand, but it

discharged and the bullet struck the back of Matthews's leg.  When Matthews attempted to get up to run away, Grant shot him in the back of the head.  Boston, Grant, and the third assailant got back in Matthews's BMW and drove away.

Somehow, Matthews got himself to his next door neighbor's house, and the neighbor called 911.  On the 911 tape, Matthews can be heard in the background telling his neighbor that Boston had attacked him.  Matthews was taken to a hospital, where he underwent surgery.  Following the surgery, Matthews spoke with investigating officers and told them that Boston, along with three other men, had attacked him and burglarized his house.  The officers showed Matthews a photograph of Boston and he confirmed that Boston was one of the attackers.

On December 1, 2014, police located Boston in Baltimore City.  They surveilled him as he and Grant and an unidentified woman entered a vehicle near the 3400 block of Round Road.  The police followed the vehicle and eventually made a traffic stop during which Boston and Grant were arrested.  The police recovered a "Colt .45 caliber handgun" from "the front waistband of . . . Boston's sweatpants."  They also recovered a ".32 semi-automatic handgun" from where Grant had been sitting in the vehicle immediately before being arrested.

We shall include additional facts in our discussion of the issues.

# DISCUSSION

## I.

### *The Recorded Telephone Conversation*

At the times relevant to this case, Jonte Lee, Boston's older brother, was incarcerated at the Baltimore County Detention Center ("Detention Center"). On November 30, 2014, the day after Matthews was attacked, Lee placed a telephone call from the Detention Center to his girlfriend. Before Lee started to speak, an automated recording announced: "This call will be recorded and subject to monitoring at any time."

Near the beginning of the conversation, Lee asked his girlfriend to call Boston toward the end of the call. After Lee and his girlfriend had talked for a while, Lee told her to try to call Boston. She then dialed Boston into the call. The pertinent portions of the recorded call with Boston on the line are as follows:

MR. LEE: What's up, dumb ass?

[BOSTON]: What's up, dumb ass?

MR. LEE: What are you—what you— are you good?

[BOSTON]: Yeah, man. I'm all right.

MR. LEE: You sure? I know it ain't nothing you can talk to me about but —you feeling me?

[BOSTON]: Yeah. Everything's (indiscernible) I ain't said nothing (indiscernible).

MR. LEE: I'm putting you in my prayers; you heard me?

[BOSTON]: Yeah, bro.

MR. LEE: I just wanted to tell you I love you, before — before — before me anything.

[BOSTON]: I love you, too, man.

MR. LEE: Just in case the n***** don't get back in contact; you feeling me? But I hope you stay (indiscernible); you hear me?

[BOSTON]: Yeah.

*     *     *

[BOSTON]: Yeah. I'm going around (indiscernible) tomorrow, for real.

MR. LEE: Oh, why, oh, why, oh, why, oh why? Damn, yo.

[BOSTON]: I know you heard though.

MR. LEE: Yeah. Mother f—ker[2] Kim called Keonia (phonetic) and shit.

[BOSTON]: Huh?

MR. LEE: Kim called Keonia.

[BOSTON]: What about?

MR. LEE: This n*****, yo; on, my God, yo. Hello?

[BOSTON]: (Indiscernible) lit them.

MR. LEE: Huh?

[BOSTON]: He lit.

MR. LEE: Huh?

[BOSTON]: He lit like wheezing.

MR. LEE: He live?

---

[2] This alteration was made by the transcriber.

[BOSTON]: He lit.

MR. LEE: Lit?

[BOSTON]: He light up (indiscernible) he got a light on him.

MR. LEE: Oh.

(Pause.)

MR. LEE: Damn, yo.

[BOSTON]: (Indiscernible).

MR. LEE: (Indiscernible) was it — was it — was it — you feeling me? Does it come out?

[BOSTON]: No.

MR. LEE: It ain't coming how you want it to?

[BOSTON]: No.

MR. LEE: I hope you all right, my n*****.

[BOSTON]: They say Shorty got hit a (indiscernible) times, twice in the face, once in the head (indiscernible).

MR. LEE: Yeah, I heard.

(Pause.)

[BOSTON]: I don't know, bro.

MR. LEE: Yeah. I heard.

(Pause.)

MR. LEE: That shit crazy. Oh, and that Kim — Kim called Keonia, talking about he saying — saying the name; you feeling me?

[BOSTON]: Yeah. He say — you know.

(Pause.)

MR. LEE: I just wanted to make sure you was good, my n*****.  Yep.

[BOSTON]: Yeah.

MR. LEE: I'm going to try —

[BOSTON]: I'm —

MR. LEE: Huh?

[BOSTON]: — (indiscernible) might be out of town for a little bit.

MR. LEE: I'm going to try to call you again tomorrow; you hearing me, dummy?

[BOSTON]: All right. I'm not sure if she'll remember but I'm going to switch to another — but I'm (indiscernible) —

\*     \*     \*

MR. LEE: Yo, make sure you write me a letter or something real quick, if you can, tonight; you feeling me?

[BOSTON]: Huh?

MR. LEE: And drop it off.

[BOSTON]: Huh?

MR. LEE: Drop it off somewhere or mail it to me or something; you feeling me, so I can hear (indiscernible).

[BOSTON]: I'm going to write it and then drop it off at (indiscernible).

MR. LEE: All right.  So, I can hear from you, my n*****.

[BOSTON]: All right.

MR. LEE: I love you.

[BOSTON]: I love you, too, bro.

MR. LEE: All right. And keep checking on — keep calling my girl phone, letting her know you all right, n*****, so I ain't got to worry about it.

At the outset of trial, before jury selection, Boston's lawyer orally moved *in limine* to preclude the State from introducing the recorded telephone call between Lee and Boston into evidence. She argued that Boston "did not waive his right to not be recorded" and that the conversation did not specifically mention Matthews or the date on which the attack on Matthews took place and therefore was too vague to be admitted. Finally, she argued that the conversation was "extremely prejudicial" and that its prejudice outweighed its probative value. The trial court denied the motion. Later, the court granted defense counsel a continuing objection based on these arguments.

The trial proceeded and eventually the prosecutor sought to introduce the recorded conversation through Detective Matthew Barnes, the lead detective in the case. Defense counsel objected on the basis of relevance, and the court recognized her continuing objection. The court denied the motion. The prosecutor played for the jury the very beginning of the recorded call, in which the automated recording was played and Lee asked his girlfriend to add Boston to the call later, and the portion of the recorded call between Lee and Boston. Detective Barnes identified Boston's voice on the call.[3]

---

[3] An audio disc of the full recorded telephone call—not just the portion in which Lee and Boston were conversing—was moved into evidence. During Detective Barnes's testimony, the part of the telephone call in which Lee and Boston spoke was played. The entire trial, including recordings played for the jury, was digitally recorded, *i.e.,* there was no court reporter present.

(Continued…)

On appeal, Boston argues that the recording of his telephone conversation with his brother was inadmissible as a matter of law because it was made in violation of the Maryland Wiretapping and Electronic Surveillance Act, Md. Code (1974, 2013 Repl. Vol.), §§ 10-401 *et seq.* of the Courts and Judicial Proceedings Article ("CJP") ("the Wiretap Act"). He further argues that, in any event, the conversation was not sufficiently linked to the attack on Matthews to be relevant evidence and, if it was, any probative value it had was outweighed by the likelihood that it would cause unfair prejudice.

**A.**

Boston maintains that his telephone call with Lee was recorded in violation of the Wiretap Act because he did not consent to its being recorded. Specifically, he was added to the call after the warning that it was being recorded was played, so he did not know the call was being recorded and therefore could not have consented. The State responds that

(…continued)

For reasons we do not understand, the court reporter who prepared the trial transcript did not include in her transcription the portion of the recording that was played for the jury at trial. After this appeal was noted, counsel for Boston filed an unopposed motion to supplement the record, which was granted. He arranged for a court reporting company to prepare 1) a transcript of the recorded telephone conversation between Boston and Lee that was played at trial; 2) a transcript of the audio disc of the entire telephone call; 3) an excerpt of the automated warning at the beginning of the call; and 4) an excerpt, apparently transcribed directly from the audio disc, of the portion of the call between Lee and Boston. We have quoted from the transcript of the recording of the conversation between Lee and Boston as it was played at trial, as we know the jurors heard that. We do not know whether they listened to the audio disc during deliberation. We point this out only because there are minor discrepancies between the transcripts.

Boston failed to make an adequate showing that the recording was obtained in violation of the Wiretap Act.[4]

"Except as otherwise specifically provided in [the Wiretap Act] it is unlawful for any person to . . . [w]illfully intercept . . . any wire, oral, or electronic communication." CJP § 10-402(a)(1).[5]  A telephone conversation is a "wire communication" within the meaning of the Wiretap Act.  *Fearnow v. Chesapeake & Potomac Tel. Co.* 104 Md. App. 1, 34–35 (1995), *rev'd on other grounds*, 342 Md. 363 (1996).[6]  The meaning of

---

[4] Under Rule 4-252(a)(3) and (b), a motion to suppress evidence based on the Wiretap Act is a mandatory motion to be made before trial, within the time limits specified, unless the court orders otherwise, for good cause shown.  Boston did not make his motion in conformity with the rule.  When his counsel made the motion, orally, before the jury was selected, the State did not object, however, or argue waiver, and the court considered and ruled on the motion.  On appeal, the State points out, in a footnote, that Rule 4-252 was not complied with, but does not argue that Boston's issue is not preserved for review, was waived, or should not be considered by this Court.

[5] It also is illegal, except as specifically provided, for any person to willfully disclose, or endeavor to disclose, or willfully use, or endeavor to use, the contents of a wire, oral, or electronic communication obtained in violation of the Wiretap Act.  *See* CJP § 10-402(a)(2) and (3).

[6] The Wiretap Act defines "wire communication" as

> any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of a connection in a switching station) furnished or operated by any person licensed to engage in providing or operating such facilities for the transmission of communications.

Maryland Code (1974, 2013 Repl. Vol.), § 10-401(18) of the Courts and Judicial Proceedings Article ("CJP").

"intercept" under the Wiretap Act encompasses electronic recording.[7]    In addition to proscribing unlawful acts, the Wiretap Act identifies acts that are lawful.  As pertinent here, an interception is lawful "where all of the parties to the communication have given prior consent to the interception[.]"    CJP § 10-402(c)(3).[8]  A communication that is intercepted unlawfully under the Wiretap Act may not be received in evidence at trial. CJP § 10-405(a).[9]  *See Seal v. State*, 447 Md. 64, 71 (2016).

There is no evidence that Boston expressly or implicitly consented to having his telephone call with Lee recorded.  *See* footnote 15, *infra*.[10]  Accordingly, the recording of the telephone call would be an unlawful act under the Wiretap Act if the call was

---

[7] The Wiretap Act defines "intercept" to mean "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  CJP § 10-401(10).

[8] Even if all parties have given prior consent to the interception, however, it is not lawful if "the communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or this State." CJP § 10-402(c)(3).

[9] CJP section 10-405(a) provides:

[With an exception that is not relevant], whenever any wire, oral, or electronic communication has been intercepted, no part of the contents of the communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of this State, or a political subdivision thereof if the disclosure of that information would be in violation of this subtitle.

[10] Nor is there any evidence that the interception of that call was lawful under any other provision of CJP section 10-402.

-11-

"willfully intercepted" by the Detention Center. CJP § 10-402(a)(1).[11] In *Deibler v. State*, 365 Md. 185 (2001), the Court of Appeals addressed the meaning of "willfully" for purposes of CJP section 10-402(a). There the defendant placed a recording device in the bathroom of his friend's family's house. After the friend's aunt used the bathroom, took a shower, and dried herself off, she noticed an unfamiliar piece of equipment hidden in the bathroom. As she and the friend's father tried to figure out what it was, the device recorded their conversation. Ultimately, the defendant admitted placing the equipment to record sounds in the bathroom, but maintained that the interception of the conversation between the friend's aunt and his father was not willful, under the Wiretap Act, because he did not know that his conduct was prohibited by the Wiretap Act.

The Court reviewed the "bewildering array" of meanings given the word "willful" under federal and Maryland law, and ultimately concluded that the defendant need not have acted with knowledge that he was violating the Wiretap Act to have "willfully intercepted" the conversation in question. As relevant here, the Court held that for purposes of CJP sections 10-402(a) and 10-405, "an interception that is not otherwise specifically authorized is done willfully if it is done intentionally-purposely." *Id.* at 199. Because the defendant "intentionally and deliberately intercepted an oral communication," he violated CJP section 10-402(a). *Id.* at 201.

---

[11] The Wiretap Act defines a "[p]erson" to include "any employee or agent of this State or a political subdivision thereof[.]" CJP § 10-401(14). The Detention Center is a part of the Baltimore County Department of Corrections.

In the case at bar, the Detention Center willfully intercepted the telephone conversation between Lee and his girlfriend, *i.e.*, it recorded their conversation intentionally and with the purpose of doing so. At the inception of the call, the Detention Center warned Lee and his girlfriend that their call was being recorded and would be monitored. They proceeded to talk, thereby consenting to their call being recorded. *See State v. Maddox*, 69 Md. App. 296, 301(1986) (stating that consent for purposes of the Wiretap Act can be expressly or implicitly given). The question is whether the Detention Center "willfully intercepted" the telephone conversation between Lee and Boston, which happened during the originally placed call when Lee's girlfriend added Boston to the call. This question has not been addressed in Maryland. It has been addressed twice in Massachusetts, however, which has a wiretap act that in all significant respects is like Maryland's Wiretap Act.[12]

In *Commonwealth v. Ennis*, 439 Mass. 64 (2003), Knight, a prison inmate, placed a telephone call to Williams. At the beginning of the call, an automated recording announced that the call was being recorded and that the call would disconnect if the recipient (Williams) activated a three-way call, *i.e.*, added another person to the call. Despite the warning, Williams dialed Ennis into the conversation. The call was not

---

[12] *See* Mass. Gen. Laws ch. 272, § 99 (2017). The Maryland Wiretap Act was fashioned after the Federal Wiretap Act, 18 U.S.C. §§ 2510 *et seq.*, but the federal statute requires consent by only one party to a recorded call. 18 U.S.C. § 2511(2)(c) & (d). Therefore, when a prisoner consents to having a telephone call in which he is participating recorded, it is not a violation of the Federal Wiretap Act when the other participant or participants in the call do not consent. *See United States v. Faulkner*, 439 F.3d 1221, 1225 (10th Cir. 2006).

disconnected and no new automated warning played. Ennis made incriminating statements during the recorded call.

Before his trial on charges of first degree murder, Ennis moved to preclude the Commonwealth from introducing the recorded call into evidence, arguing that the department of corrections had recorded the telephone call without his consent, in violation of the Massachusetts wiretap act. The Commonwealth responded that the recorded call was admissible because the department of corrections did not willfully intercept Ennis's statements. The trial court granted Ennis's motion and the Commonwealth noted a permissible interlocutory appeal.

The case reached the Massachusetts Supreme Judicial Court, which reversed. The court explained that "not every recording of an oral communication without the knowledge of all participants is an 'offense,' nor is every such recording 'unlawful' or 'illegal.'" *Id.* at 68–69. The Massachusetts wiretap act, like Maryland's statute, requires that, to be unlawful, a telephone call must have been intercepted, *i.e.*, recorded, "willfully." The court concluded that willfulness was not shown:

> The department did willfully record inmate Knight's telephone call to Williams, announcing to both parties that their conversation would be recorded. But the department affirmatively sought to prevent any additional party from being added to that two-party telephone conversation. . . . There is no evidence that the department's system failed or that the department could have taken other steps to prevent Williams from including Ennis in the telephone conversation. By whatever means (the record is not clear) Williams was able to bypass the feature intended to disconnect the call. Certainly the department did not "secretly record" any part of the resulting conversation willfully. The department informed all of the anticipated parties to the . . . telephone call that their communications would be recorded.

-14-

*Id.* at 69–70 (citations and footnote omitted). The court stated: "The wiretap act is not so broad as to impose liability each time an additional party is added to a two-party conversation in circumstances beyond the recorder's knowledge, direction, or control." *Id.* at 70.

Five years later, the Supreme Judicial Court of Massachusetts extended its holding in *Ennis* to cover a situation in which a third party was added to a call simply by having the telephone handed to him. In *Commonwealth v. Boyarsky*, 452 Mass. 700 (2008), the defendant was convicted of first degree murder in the beating and stabbing death of the victim. At trial, the Commonwealth introduced recordings of telephone calls the defendant made from the jail where he was being held before trial. During some of the calls, the recipient, who had heard the automated announcement at the outset of the call that the call was being recorded, passed the telephone to another person, who had not heard the announcement. In the portions of the calls with these third parties, the defendant made incriminating statements.

On appeal, the defendant argued that those calls were recorded in violation of the Massachusetts wiretap act, as the people with whom he was speaking had not been informed that they were being recorded, did not otherwise know that that was the case, and therefore had not consented to being recorded. The court rejected this argument, explaining that there was no evidence "that those responsible at the jail for recording calls had any knowledge that the initial recipient of the defendant's telephone call had passed the telephone to someone else and no evidence in any event that the jail had any power to prevent such an occurrence." 452 Mass. at 707. It concluded that the interception was

not willful: "As was true in *Ennis*, the absence of knowledge, power, and control on the jail's part signifies that the interception could not be deemed willful." *Id.*[13]

The facts in *Ennis* and *Boyarsky* are similar to those in the case at bar, in that a third party was added to the call after the automated recording was played and apparently did not know that the call was being recorded. In *Ennis*, there was evidence that the correctional facility had a policy prohibiting three-way calls. In *Boyarsky*, there was no evidence that the correctional facility had a policy limiting calls to only the initial recipients. The parties here have not referenced any policy governing telephone calls placed by inmates at the Detention Center. We are aware, from our own research, that the *Baltimore County Department of Corrections Inmate Handbook & Rules* (2013-2014) ("Handbook"), which covers "Telephone Privileges" for inmates, makes telephone calls by inmates "subject to recording and monitoring." Handbook at 11. The Handbook provides that calls by inmates are collect calls, and, if an intended recipient uses a carrier other than Verizon, the recipient must set up an account with ICSolutions. *Id.* The

---

[13] In Maryland, when one party consents to his or her telephone conversation being recorded but the other does not, the recording nevertheless is admissible against the party who consented. *State v. Maddox*, 69 Md. App. 296 (1986). Thus, Maryland defendants in Boyarsky's situation would not be heard to object to the admission of a recording of their telephone conversation with a third party because they consented to the recording, even if the third party did not.

-16-

"Telephone Privileges" portion of the Handbook says nothing about three-way calls or adding a third person to a call, however.[14]

We agree with the reasoning of the court in *Ennis* and *Boyarsky*, and hold that although the Detention Center's recording of Lee's call to his girlfriend was an intentional, purposeful act, *i.e.,* was willful, its recording of Boston's portion of the telephone conversation was not. A call by an inmate at the Detention Center commences with its placement to the party being called, at which point the inmate and the recipient of the call are notified that the call is being recorded and monitored. The call is between those two people and the intent to record is directed to them. Even in the absence of a policy prohibiting the later addition of a third participant to an inmate call, the Detention Center ordinarily would not be acting "willfully" by continuing to record the call once it came to include the third participant.

---

[14] We also are aware from our research of The Department of Public Safety and Correctional Services ("Department") Executive Directive (Number OPS. 200.0002 Revised (effective August 31, 2015)), which "continue[d]" an inmate telephone system that applies to all inmates housed in a Department correctional facility. *Id.* at .02. According to the directive, "correctional facility" means a structure used to house inmates in the custody or detained by the Department, as defined in Correctional Services Article, section 1-101, Annotated Code of Maryland[,]" including inmates detained at "a detention or pretrial facility." *Id.* at .04(B)(5)(a) and (b). Although the general statutory definition of "correctional facility" does not draw a distinction between State and local correctional facilities, it appears that the directive applies to State correctional facilities and local correctional facilities under State control, such as the Baltimore City Detention Center. The directive sets forth a number of prohibitions, including that "[a]n inmate may not: . . . [i]nitiate or participate in a three-way call or call forwarding[.]" *Id.* at .05D(1)(h).

-17-

In his abbreviated motion to suppress, Boston alleged only that his telephone conversation with his brother was recorded in violation of the Wiretap Act. He did not assert any constitutional or non-statutory violation. We conclude, therefore, that as the proponent of the motion it was Boston's burden to produce evidence to show that the Wiretap Act was violated and to persuade the court to so rule. Unlike defense motions seeking the suppression of evidence obtained by a warrantless search, where, because the search is presumptively unconstitutional, and therefore the State bears the burden of production and persuasion, *see e.g., McCain v. State*, 194 Md. App. 252, 278 (2010), the defense motion here did not enjoy the benefit of a presumed violation of the Wiretap Act.

Boston did not produce any evidence in this case of what the Detention Center's monitoring of inmate telephone calls consists of—whether calls are listened to as they are happening and if so whether *all* calls are listened to. Nor did he produce any evidence that, if any such monitoring takes place, telephone calls may be disconnected depending upon what the monitoring reveals. Just as the court in *Boyarsky* observed, without evidence of knowledge, power, and control on the part of the Detention Center, its recording of a conversation between an inmate and a person who was not the recipient of the inmate's call but was added to the call by the recipient is not willful. At most it would be inadvertent.

In sum, Boston sought to have his recorded telephone conversation with his brother excluded from evidence as having been obtained in violation of the Wiretap Act, but did not offer evidence that would support a finding that the Detention Center willfully intercepted that call. In the absence of proof that the Detention Center violated the

Wiretap Act by recording the call in question, the recording was not inadmissible under that act.[15]

**B.**

"Our standard of review on the admissibility of evidence depends on whether the 'ruling under review was based on a discretionary weighing of relevance to other factors or on a pure conclusion of law.'" *Perry v. Asphalt & Concrete Services, Inc.*, 447 Md. 31, 48 (2016) (quoting *Parker v. State*, 408 Md. 428, 437 (2009)). We generally review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Id.* (quoting *Ruffin Hotel Corp. of Maryland, Inc. v. Gasper*, 418 Md. 594, 619 (2011)). We apply a *de novo* standard of review, however, when deciding whether evidence is relevant because "we determine whether evidence is relevant as a matter of law." *Id.* (citing *State v. Simms*, 420 Md. 705, 725 (2011)). To state it differently, "[a]lthough trial judges have wide discretion 'in weighing relevancy in light of unfairness or efficiency

---

[15] In its brief, the State also argues there were facts from which the trial court reasonably could have inferred that Boston knew his telephone call with Lee was being recorded, but still continued to speak, thereby implicitly consenting to being recorded. *See State v. Maddox*, 69 Md. App. 296, 301 (1986) ("[W]hen one party to a conversation expressly or *implicitly* consents to the recording of that conversation, the recording is admissible in evidence against the consenting party[.]") (emphasis added). As the State points out, in parts of the telephone conversation Boston demonstrates an awareness that Lee is incarcerated at the Detention Center. The State argues that there was evidence that Boston himself had been incarcerated there and would have known that calls by inmates are recorded. We do not see any such evidence in the record, however, or any facts from which an inference could have been drawn that Boston had prior knowledge that all calls placed from the Detention Center are recorded. He may well have known that, but the record does not furnish such evidence.

considerations, trial judges do not have discretion to admit irrelevant evidence.'" *Id.* (quoting *Simms*, 420 Md. at 724).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401.

The recorded telephone conversation between Boston and Lee was offered by the State to show consciousness of guilt on Boston's part. In *Thomas v. State*, 372 Md. 342, 352–53 (2002), the Court of Appeals explained the inferences that must be established for consciousness of guilt evidence to be relevant, including the inference that the defendant's consciousness of guilt is of the crime charged. Boston argues that there was insufficient evidence to support the inference that the words he spoke during his telephone conversation with Lee, about changing his contact information and leaving the area, showed consciousness of guilt of the crimes against Matthews. We disagree.

In the telephone call, Boston suggested that he intended to leave the area and change his contact information:

> [BOSTON]: (Indiscernible) might be out of town for a little bit.
>
> MR. LEE: I'm going to try to call you again tomorrow.
>
> [BOSTON]: All right. I'm not sure if she'll remember but I'm going to switch to another — but I'm (indiscernible).

He then made reference to information connected to the attack on Matthews:

> MR. LEE: (Indiscernible) was it — was it — was it — you feeling me? Does it come out?
>
> [BOSTON]: No.

-20-

MR. LEE: It ain't coming how you want it to?

[BOSTON]: No.

MR. LEE: I hope you all right, my n*****.

[BOSTON]: *They say Shorty got hit a (indiscernible) times, twice in the face, once in the head (indiscernible).*

\* \* \*

MR. LEE: That shit crazy. Oh, and that Kim — Kim called Keonia, talking about he saying — saying the name; you feeling me?

[BOSTON]: Yeah. He say — you know.

(Emphasis added.) Thus, Boston is describing a victim who was shot in the head several times and is still alive—a very particular and unusual set of events that matches what happened to Matthews. In addition, he and Lee discuss the fact that the victim is "saying the name," *i.e.,* that he is telling the police who attacked him, which Matthews in fact was doing. We conclude that the substance of the recorded telephone conversation was sufficient to show consciousness of guilt on Boston's part over the crimes against Matthews and therefore was relevant evidence.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" Md. Rule 5-403. Boston's unfair prejudice argument is essentially the same as his relevance argument. He asserts that "[b]ecause there was no evidence connecting the conversation to the charges in this case, the [trial] court erred in permitting the state to play the recorded jail call between . . . or Mr. Boston and his brother." We disagree for the reasons just stated. The trial court

did not abuse its discretion by deciding that the probative value of the recorded call was not substantially outweighed by the danger of unfair prejudice.

## II.

### *The Gun*

Officer Shawn Anderson was one of the officers who interviewed Matthews following his surgery. He testified that in the interview Matthews identified the weapons used against him as a "[b]lack Tech []9, a black .22, and two black []9 millimeter handguns."[16] As noted, when the police arrested Boston, they found a black "Colt .45 caliber handgun" in his sweatpants. Before trial, Boston moved *in limine* to preclude the State from introducing that handgun into evidence. His lawyer argued that the gun was not relevant and was "more prejudicial than probative":

> Your Honor, Mr. Boston was riding in a vehicle and the police were trying to locate him with respect to this matter. On his person at that time was a handgun. Your Honor, that handgun has not been physically linked to this particular incident. As a matter of fact, I believe it's a .45[. T]hat was the handgun that was found. The witness described the guns that were used that particular evening, a []9 millimeter and I believe a .32 caliber. So it was not even described by the alleged victim in this case.
>
> Your Honor, for the Court's knowledge, Mr. Boston is also charged in another matter in Baltimore City and that gun has been linked to an incident [in] that particular case. Mr. Boston made a statement to the police when he was arrested and detained and brought to the Headquarters indicating in his statement that he did buy—he was in possession of the gun. He admitted to being in possession of a gun, but he bought the gun after this particular event.

---

[16] It is unclear which of these guns Boston used. Presumably, it would have been the black Tech 9 or either of the two black 9 millimeter handguns because at trial Matthews described Grant as using a "little . . . [.]22."

Your Honor, I believe that the introduction of this gun without being able to link it even by the victim even though there were multiple guns used, but the victim does not even describe this gun. He was very specific about the guns that were described in this case and this .45 caliber is not one that was described. Introducing this gun is more prejudicial than probative in this case . . . the State is trying to force Mr. Boston to get on the stand and say no, this gun wasn't used in this case, but it was used in another case.

The prosecutor opposed the motion, arguing that Matthews would "be absolutely clear about the fact that there was more than one gun used in the assault against him." She further argued that the gun was "probative" of whether Boston had attempted to shoot Matthews because he was in possession of a gun two days after the attack and "in [the] company of a person [Grant] who [wa]s in possession of the gun that was used to shoot Steven Matthews."

Ultimately, the court denied the motion:

I think it's relevant given the fact that the victim identified that there was more than one weapon. There were two guns and that this gun was found at the same time the arrest of the Co-defendant who had the gun that was linked to this crime. I think yes, it is predicial [sic], but I think it is more probative than prejudicial. So I'll deny the motion.

Matthews testified that the gun Boston attempted to shoot him with was "a []9 or a [.]45 chrome whatever it was." Over Boston's objection, the State moved the .45 caliber handgun into evidence.

On appeal, Boston contends the trial court erred by admitting the .45 caliber handgun into evidence and permitting testimony about it. He repeats the arguments he made below, namely that the gun "was irrelevant and highly prejudicial." He maintains that the gun was irrelevant evidence because "the State offered nothing more than sheer

speculation that the gun that police found on Mr. Boston during his arrest was a gun used during the home invasion and attack on Mr. Matthews." He argues that the gun and the evidence about it was substantially prejudicial because the jury could conclude that Boston "was simply a man of questionable character[,]" especially because he "could not be expected to take the stand and explain why he was arrested with the gun, because an admission that the gun related to other, uncharged crimes, would still prejudice his defense."

"'[P]hysical evidence need not be positively connected with the accused or the crime to be admissible; it is admissible where there is a reasonable probability of its connection with the accused or the crime[.]'" *Aiken v. State*, 101 Md. App. 557, 573 (1994) (quoting *Brooks v. State*, 24 Md. App. 334, 344 (1975)). Thus, the .45 caliber handgun was relevant evidence if there was a reasonable probability that it was connected to the crimes that Boston was charged with committing.

Two cases are pertinent. In *Aiken*, the defendant robbed two victims at gunpoint and then raped one of them. The first victim told the police the gun the defendant used was a small, blue handgun with a round chamber. The second victim told the police the gun was a small, black revolver. A month and a half after the crimes, the police arrested the defendant and recovered a black .38 caliber revolver in the immediate vicinity of his arrest.

At trial, the first victim testified that the gun was a black handgun. When she was shown the .38 caliber revolver, she said it was similar to the gun used against her, but could not definitively say it was the same gun. The second victim also testified that the

guns were similar.  The defense moved to exclude the .38 caliber revolver from evidence.

The trial court denied the motion.  On appeal, this Court affirmed.  We held that the "gun

was sufficiently connected to the crimes" charged against the defendant to make its

admission proper.  *Id.* at 574.

Likewise, in *Grymes v. State*, 202 Md. App. 70 (2011), we ruled that a trial court

properly admitted a gun into evidence.  There, the defendant used a gun in robbing the

victim.  The day of the robbery, a person familiar with the defendant told the police that

she had seen him with a gun that had a long black barrel and brown handle, and that the

gun could have been in the laundry room of the apartment building where the defendant

was staying.  The police searched the laundry room and found the gun.  Also on the same

day as the robbery, the victim told the police the gun had had a long barrel, was black

with a brown handle, and possibly was a .38 caliber.  At trial, however, the victim

testified that the gun was silver with a brown handle.   In upholding the trial court's

decision to admit the gun into evidence, we stated that the evidence "was sufficient to

create a 'reasonable probability' that the gun was connected to the" defendant, and that it

was within the province of the jury to determine the weight to give that evidence.  *Id.* at

104.

We return to the instant case.  Matthews testified at trial that Boston attempted to

shoot him with "a []9 or a [.]45 chrome whatever it was."  The .45 caliber handgun was

recovered from Boston 36 hours after the attack, from the same vehicle and at the same

time that the .32 caliber handgun Grant used to shoot Matthews was recovered.  The fact

that Matthews had provided an earlier inconsistent description of the precise caliber and

color of the handgun did not make the .45 caliber handgun irrelevant to the case; the inconsistent descriptions went to the weight of the evidence and were fodder for cross-examination.

As noted, under Rule 5-403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. A trial court exercises its discretion when it balances the "probative value" of the evidence against its potentially unfair prejudicial effect. *Perry*, 447 Md. at 48.

Boston argues that the .45 caliber handgun was prejudicial evidence in that it could have led the jury to think he was of questionable character. The test is not whether prejudice exists, however. It is whether there is unfair prejudice that substantially outweighs the probative value of the evidence. The gun, which was partly described by Matthews at trial, was found on Boston not long after Matthews was attacked and was in the vicinity of other guns used against Matthews, was highly probative of Boston's involvement in the crimes against Matthews.

Boston also argues that the gun was unfairly prejudicial because he had used it in another crime, but he could not explain that to the jury without harming his defense. He relies on *Thompson v. State*, 393 Md. 291 (2006). There, shortly after an attempted murder, the defendant, who was riding his bike, was followed by a police officer. He pedaled away from the officer, but was caught minutes later with 86 vials of crack cocaine. At the defendant's trial for attempted murder, there was no evidence elicited about the crack cocaine, and the defendant did not testify, thus offering the jury no explanation for why he attempted to flee from the officer.

The trial court instructed the jury that flight after the commission of a crime may be considered as evidence of guilt if the flight demonstrated a consciousness of guilt. Ultimately, the Court of Appeals held that this jury instruction was given in error because it was misleading. The jury did not know that the defendant had been in possession of a significant amount of crack cocaine and, thus, was unaware of a reasonable justification for his flight that had nothing to do with the attempted murder. Nor could the jury be told of that fact without prejudicing the defendant. Accordingly, the "circumstances of the case . . . impaired the confidence with which the inference that [the defendant] fled from the police due to a consciousness of guilt with respect to the [attempted murder charges] could be drawn[.] *Id.* at 315."

*Thompson* is easily distinguishable. Because the defendant there had crack cocaine in his possession, it was clear that there was a reasonable justification for his flight from the police unconnected with the attempted murder. Here, Boston merely proffered that the gun was used in another criminal matter. There was no other evidence to support that and the trial court was not obligated to believe that proffer. The admission of the gun in evidence was not misleading in the way the flight instruction in *Thompson* had been. From the evidence presented, there still was a reasonable probability that the gun was connected to the crimes for which Boston was charged. The trial court did not abuse its discretion in ruling that the probative value of the .45 caliber gun was not substantially outweighed by any potential unfair prejudice.

# III.

## *The Jacket*

In the early morning of November 30, 2014, only a few hours after the attack on Matthews, detectives with the Baltimore County Police Department executed a search warrant at Matthews's house. During the search, they discovered a black Calvin Klein jacket draped over a couch. There were three bags of marijuana in the pocket of the jacket. The detectives confiscated the marijuana but left the jacket where it was because they thought it belonged to Matthews and "did not know if it was actually of evidentiary value." When the search was finished, the detectives locked Matthews's house.

On December 3, 2014, Matthews, who was still in the hospital, asked a family member to bring him a jacket from his house so he would have one to wear when he left the hospital. The family member returned with the black Calvin Klein jacket. Matthews realized the jacket did not belong to him, so he called the detectives. They took the jacket and submitted it for DNA analysis.

Christina Tran, a forensic biologist for the Baltimore County Police Department, examined the jacket and detected amylase and acid phosphatase on the left cuff. Amylase is an enzyme found in high quantities of saliva and acid phosphatase is an enzyme found in high quantities of semen. Tran took a cutting from the left cuff of the jacket and sent the cutting to Bode Technology for DNA testing. The test results showed that the jacket contained a "DNA profile consistent with a mixture of two individuals, including a major male contributor" whose DNA profile matched Boston's.

At trial, the State sought to admit the jacket into evidence. Detective Eli Visnick testified that the jacket appeared to be the same one he had seen at Matthews's house during the search on November 30, 2014, and also the same one he had obtained from Matthews at the hospital on December 3, 2014, "minus the markings from . . . [the] Crime Lab and Forensic Unit." Matthews testified that pictures of the jacket taken at his house after the crimes showed the same jacket that his family member brought him from his house on December 3. Boston objected to the jacket's admission, arguing that the State did not establish a sufficient chain of custody to account for what could have happened to the jacket from November 30 to December 3, 2014.

The trial court initially reserved ruling, but later overruled Boston's objection:

> With respect to the . . . jacket that I reserved on, the testimony with the condition of the jacket remains the . . . same as when this detective first took possession of the jacket. There's no evidence of any tampering since that time so the objection is overruled and Exhibit 52 [the jacket] is admitted.

On appeal, Boston contends the trial court abused its discretion by admitting the jacket because the State did not sufficiently establish its chain of custody. Specifically, he asserts that the "[p]olice did not take the jacket into evidence until four days after the home invasion. None of the State's witnesses could say with certainty who had access to the jacket or whether the jacket underwent any transformations before Mr. Matthews's relative brought it to the hospital." The State retorts that the trial court acted within its discretion by admitting the jacket because "the State . . . sufficiently demonstrated that there was not a reasonable probability that the jacket had been altered in the three days between November 30 . . . and December 3." We agree with the State.

-29-

A proper chain of custody is established when "there is a 'reasonable probability that no tampering occurred.'" *Cooper v. State*, 434 Md. 209, 227 (2013) (quoting *Breeding v. State*, 220 Md. 193, 199 (1959)). The purpose of establishing chain of custody is to "'preclude a likelihood that the . . . condition [of the piece of evidence] was changed.'" *Wagner v. State*, 160 Md. App. 531, 552 (2005) (quoting *Best v. State*, 79 Md. App. 241, 250 (1989)). Missing links from the chain of custody do not, as a matter of law, mandate exclusion of the evidence; rather, "gaps or weaknesses in the chain of custody generally go to the weight of the evidence[.]" *Easter v. State*, 223 Md. App. 65, 75 (2015); *see also* Lynn McClain, *Maryland Evidence, State & Federal*, § 901:2 at 851–52 (3d ed. 2013) ("The proponent's chain of custody evidence need not preclude all possibilities of tampering or mistake; it need only show a reasonable probability that no tampering or mix-up has occurred.").

To be sure, the State did not definitively rule out the possibility of tampering. It is possible that someone with access to Boston's saliva and semen broke into Matthews's locked house between November 30 and December 3, 2014, and planted those bodily fluids on the black Calvin Klein jacket that did not belong to Matthews. Such a scenario is highly unlikely, however, and, the mere *possibility* of tampering does not mandate exclusion. *See Wagner*, 160 Md. App. at 552–53 (glove was admissible even though it was discovered outside by a neighbor who placed it on her back porch and gave it to police two days after the murder).

Detective Nacke testified that, other than the markings from the Crime Lab and Forensic Unit, the jacket was in the same or substantially the same condition as it was

-30-

when he saw it at Matthews's house on November 30, 2014, and as it was when he collected it from Matthews at the hospital on December 3, 2014. He also testified that Matthews's house was locked after the November 30 police search. Finally, Matthews testified that the black Calvin Klein jacket that was brought to him in the hospital was the "[s]ame exact jacket" from the pictures of the crime scene. Accordingly, the trial court acted within its discretion by admitting the jacket.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**