*Cloyd James Holmes v. State of Maryland*, No. 2575, September Term 2016.  Opinion by Alpert, Paul E., J. (Senior Judge, Specially Assigned).

**MD. WIRETAP ACT – EXCLUSION OF RECORDING – ORAL CONVERSATION – PARENT-CHILD – VICARIOUS CONSENT DOCTRINE.** The trial court did not err in excluding, under the Maryland Wiretap Act, Md. Code, § 10-401 et seq. of the Courts & Judicial Proceedings Article, a recording made by an eight-year-old sexual abuse victim's mother, who used her cell phone to secretly record her face-to-face conversation with the child. A parent's surreptitious cell phone recording of her child falls within the plain language and broad reach of the Maryland Wiretap Act.  This recording cannot be admitted under the vicarious consent doctrine because even if Maryland recognized that doctrine in the circumstances here, appellant failed to establish that the mother made the recording in good faith to protect her child, rather than to protect the defendant.  The trial court did not erroneously decide the admissibility of the recording on the basis of disputed credibility proffers. The recording is not admissible substantively or as impeachment evidence.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2575

September Term, 2016

_____

CLOYD JAMES HOLMES

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Graeff,
Alpert, Paul E.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Alpert, J.
_____

Filed:  April 5, 2018

In this appeal, we consider whether a parent's surreptitious use of her cell phone to record a face-to-face conversation with her child may be used as evidence in a criminal trial of a third party. We shall hold that in the circumstances presented here, the recording was prohibited under the Maryland Wiretap Act, Md. Code (2013 Repl. Vol., 2017 Supp.), § 10-401 *et seq.* of the Courts and Judicial Proceedings Article ("CJP"). Moreover, we conclude that even if we were to recognize a narrow "vicarious consent doctrine" under which a parent may be deemed to have consented to a recording on behalf of his or her child, the recording in this case would not be admissible because appellant failed to establish that it was made in good faith for the benefit of the child.

A jury in the Circuit Court for Montgomery County convicted Cloyd James Holmes, appellant, of sexually abusing an eight-year-old girl and a related third-degree sex offense. Appellant was sentenced to a total of twelve years, with all but six years suspended, plus five years of supervised probation. He presents three questions for our review:

1. Did the circuit court err in preventing the defense from introducing a cell phone recording on the grounds that the recording violated Maryland's wiretap statute?

2. Did the circuit court err in limiting the defense's questioning of the lead detective?

3. Did the circuit court err in excluding other relevant evidence?

Concluding there was no error or abuse of discretion, we shall affirm appellant's convictions.

**FACTS AND LEGAL PROCEEDINGS**

Because appellant does not challenge the sufficiency of the evidence supporting his convictions, our summary of the trial record provides context for the issues raised in this appeal. *See Washington v. State*, 180 Md. App. 458, 461 n.2 (2008).

The charges against appellant stemmed from a single incident of sexual assault reported by B.B., who is the daughter of appellant's girlfriend, Ashley B. At the time of the incident, appellant and Ashley B. lived in an apartment, together with the couple's one-year-old son, eight-year-old B.B., and her five-year-old brother. The State's prosecution theory was that while B.B. was sleeping in her bed one night, appellant woke her; touched her vagina with his mouth, finger, and penis; then asked her to touch his penis. In support, the State presented testimony from B.B. as well as individuals to whom she reported the assault, including three family members, a police detective, and a pediatrician.

B.B. recounted that the incident occurred between Christmas 2015 and New Year's Day. That night, while the rest of the family was asleep in other bedrooms, appellant entered her bedroom wearing a robe and "went under [her] cover for the tablet," which was "a pink Kindle." He pulled down her pajama pants and underwear, put a pillow over her face, got on his knees between her legs, touched his "private part" to her private part, used his index finger to touch the outside of her private part, and "licked" her private part. She used an anatomical drawing to identify her vagina as her private part and appellant's penis as his private part.

When appellant asked her to go to the living room, she put her clothes back on and did so. B.B. testified that appellant then took a "vinegary color" substance out of a little

2

glass cup, put it on his "private part," "asked [her] to rub it[,]" and rubbed it "[a] little bit" with his own hand. When she refused to touch his private part, he asked again. After she said no a second time, appellant "said I'm sorry" and asked if she wanted to play on her tablet. The next day, when B.B. got home from school, appellant repeated his apology and warned her that if she told anyone, there "will be consequences," which "scared" her because she understood him to mean that "[s]omething bad will happen."

Around Valentine's Day, B.B. reported the incident to her grandmother and great-aunts. That day, she first told her Aunt Alandria (also known as Aunt Langie), who then called Aunt Eboni (also known as Aunt Bebe) and her grandmother Pamela Walters. All three women testified that on February 13, 2016, each individually spoke with B.B., who recounted the incident consistently during separate conversations. Pam Walters testified that B.B. told her that "after Christmas" appellant

> came into my room looking for the tablet. So then he went to pull my underwear down, but I was pulling them back up. Then he got them down. He took them off, and she said he played with me down there, then he kissed me down there, and he tried to use his finger, but his fingernail was hurting me, so I started to cry. And she said he took a pillow and he put it over her face to muffle her crying, and then she said he went and got some type of ointment and put it on his penis and tried to get her to touch it, but she was reluctant to touch it. But she said he attempted to bend her over, but she wouldn't bend when he was attempting to.

B.B. talked to a police officer the day after she reported the abuse to her family members. Montgomery County Police Detective Leonor Diaz, the lead investigator assigned to the case, interviewed B.B. Later, B.B. also recounted the incident to Dr. Evelyn Shukat, a pediatrician who testified at trial as an expert in child abuse reporting and evaluation.

3

On cross-examination, B.B. testified that she talked to her mother after coming home from the police station. When her mother asked why B.B. did not first tell her about the incident, the child answered, "because I was scared." Although she denied asking her mother "what would happen if . . . [she] had lied in [her] statement to the police," she then recalled that she asked, "will I go to jail if I lie?" B.B. later explained on re-direct that she asked her mother, "if I ever lie about something, will I have to go to jail. And then she said I won't." B.B. also recalled that during that conversation, Ashley B. went to the kitchen cupboard, "took out the cup" that appellant used during the incident, and asked "was this the cup that the stuff was in and [B.B.] said it was." When her mother asked "if it was just a dream," B.B. "said it wasn't."

On cross-examination, B.B. also acknowledged that during a Christmas party at her grandparents' house around the time of the incident with appellant, there was a heated argument between appellant and her aunts, after appellant told B.B. that if she took another piece of cake, he would "drop kick it out of [her] hand."

Appellant, testifying in his defense, denied any sexual contact with B.B. He suggested that after the Christmas Day altercation, B.B. fabricated the incident with the encouragement of her grandmother and aunts.

By Christmas 2015, appellant and B.B.'s mother had been in a relationship for two to three years. The "blended family" lived in a three bedroom apartment in Silver Spring. Although B.B. initially told him that he would never be her father, they eventually grew closer, and he read books to her, helped her with homework, and watched television together.

4

But there was friction with Ashley B.'s aunts and mother, which was evident in the Christmas Day 2015 altercation at the residence of Ashley B.'s aunt, Alandria Walters. During that family gathering, appellant admitted that he told B.B. that if she took more cake, he would knock it out of her hand. Alandria Walters yelled at him, saying, "You're not even her real father." Appellant, who had been drinking, became upset, spoke with Pam Walters and her husband, then left.

Ashley B., mother of B.B., testified in appellant's defense. According to both Ashley B. and appellant, when B.B.'s school break began around December 21, the child stayed with her grandmother, Pam Walters, and did not return home to sleep until after New Year's.

As detailed below in Part I of our discussion, after B.B. reported the incident, Ashley B. used a "voice recorder" application installed on her cell phone to record a conversation she had with B.B. Ashley B. told Detective Diaz about the recording but never sent it to her. When police came to search her home, Detective Diaz took Ashley B.'s cell phone into another room. When the phone was returned, the recording was no longer stored on it. But by then, Ashley B. had sent the recording to appellant's mother and his defense lawyer.

Although the trial court granted the State's motion to exclude that recording, Ashley B. testified about her conversation with B.B. According to Ashley B., her daughter discussed the incident, then asked "what would happen to her if it really didn't happen," and asked whether she would go to jail if she lied, while looking down and away from her mother. Ms. B. told her that she did not know what would happen. Based on that

5

conversation, Ashley B. did not believe B.B.'s accusation of appellant. But she did not ask B.B. whether she lied.

We shall add facts in our discussion of the issues raised by appellant.

## DISCUSSION

### I.     Exclusion of Cell Phone Recording

Under Md. Rule 5-104(a), admissibility of evidence is preliminarily decided by the trial court. Appellant contends that the trial court erred or abused its discretion in excluding Ashley B.'s recording of her oral conversation with her eight-year-old daughter, B.B. It was undisputed that the recording was made by Ashley B. using an application (commonly referred to as an "app") on her cell phone, without her daughter's knowledge or permission.

The State moved to exclude the recording on the grounds that it was both inadmissible hearsay and an unlawful interception under the Maryland Wiretap Act, CJP § 10-402(a). Appellant countered that the wiretap statute does not apply to a recording made in these circumstances and that even it if does, the recording should have been admitted under the doctrine of vicarious consent and Md. Rule 5-806, the impeachment exception to the rule against hearsay.

Declining to reach the hearsay question, the trial court excluded the recording as an unlawful interception under CJP § 10-402(a). The court also declined to decide whether Maryland recognizes a doctrine of vicarious consent that would allow a parent to consent to any recording made in good faith for the benefit of her child. Based on voir dire testimony and proffers from counsel, the court determined that even if the vicarious consent

6

doctrine were available, it would not apply to Ashley B.'s recording because appellant failed to establish that she made it for the protection of B.B.

Appellant asserts that "the circuit court erred in preventing the defense from introducing [the] cell phone recording on the grounds that the recording violated Maryland's wiretap statute." He offers several alternate theories in support of its admissibility. First, he contends that the statute "does not apply to a parent's recording of his or her minor child in the privacy of the home." If the statute does apply, he maintains that the court erred in failing to admit the recording under the doctrine of vicarious consent. Finally, appellant maintains that even if the recording was unlawful, the trial court abused its discretion in ordering exclusion rather than a lesser remedy and in refusing to allow it to be used for impeachment purposes under Rule 5-806.

The State advances two reasons to affirm the trial court's decision, arguing that "[e]ither rationale represented an independent bar to the admission of the audio recording[.]" First, the State asks us to affirm on the ground not reached by the trial court, i.e., that the recording was inadmissible hearsay, not subject to the impeachment exception in Md. Rule 5-806. Alternatively, the State argues that the trial court did not err in excluding the recording as a violation of Maryland's anti-wiretapping statute, based on evidence and proffers that Ashley B. did not make the recording for the protection of B.B.

For the reasons explained below, we hold that the trial court did not err or abuse its discretion in excluding the recording under the Maryland Wiretap Act.

7

## A. Standards Governing Evidence Challenged Under the Maryland Wiretap Act

In this appeal, we review the trial court's exclusion of evidence under the Maryland Wiretap Act, which provides that unless expressly exempted under the statute, an oral communication recorded in Maryland without the consent of all parties to the conversation is not admissible at trial, either as substantive evidence or impeachment evidence. *See Seal v. State*, 447 Md. 64, 71-72 (2016). CJP § 10-402(a)(1) states that, "[e]xcept as otherwise specifically provided in this subtitle, it is unlawful for any person to . . . [w]illfully intercept . . . any . . . oral . . . communication[.]" To "intercept" means "the aural or other acquisition of the contents of any . . . oral communication through the use of any electronic, mechanical, or other device." CJP § 10-401(10). "[A]ny conversation or words spoken to or by any person in private conversation" qualifies as an "oral communication." CJP § 10-401(13)(i). The willfulness *mens rea* does not require a showing of "bad motive" or "knowing unlawfulness." *See Deibler v. State*, 365 Md. 185, 199 (2001). It is sufficient to show that there was an intentional, rather than inadvertent or negligent, interception. *Id.* *Cf. Boston v. State*, 235 Md. App. 134, 150-51 (2017) (when jail unintentionally recorded a third person who was added to an inmate call after notice was given that the call was being recorded, the conversation was not "willfully intercepted").

Although the statute has an exemption for oral communications, it requires the consent of all participants to the recorded conversation. Pursuant to § 10-402(c)(3),

> [i]t is lawful under this subtitle for a person to intercept a[n] . . . oral . . . communication where the person is a party to the communication and where **all of the parties to the communication have given prior consent to the interception** unless the communication is intercepted for the purpose of

8

committing any criminal or tortious act in violation of the Constitution or laws of the United States or of this State.

(Emphasis added.)

In this respect, Maryland's statute is more restrictive than the analogous federal statute and other state laws that require the consent of only one party to the recorded conversation. As the Court of Appeals has explained,

> the two-party consent provision of the Maryland Wiretap Act is "a departure from the federal act" and is "aimed at providing greater protection for the privacy interest in communications than the federal law." Indeed, we have recognized that the provisions of the Maryland Wiretap Act constitute a declaration of the public policy of this State. In explaining its importance and history we stated:
>
> > The requirement of consent by *all* parties for the recording . . . by a private individual has been a fundamental part of Maryland law since at least 1956, and the one attempt by the Legislature, in 1973, to modify that provision met with a veto in which the Governor expressed his deep concern that the "opportunity for unwarranted spying and intrusions on people's privacy authorized by this bill is frightening." . . . Under long-standing Maryland law, therefore, a party to a telephone conversation does *not* take the risk that another party, not acting as, or under the direction of, a government agent, will record and divulge the contents of the conversation[.]
>
> The "departure" by the Maryland Wiretap Act in the consent exception – "the most important exception" in wiretap statutes – demonstrates a clear legislative intent that Maryland law afford greater privacy than does the federal wiretap statute.

*Seal*, 447 Md. at 73-74 (citations and footnotes omitted).

In addition, the Court of Appeals has repeatedly instructed that "the procedures underlying the Maryland Wiretap Act and its exceptions must be strictly followed." *Id.* at 71. Accordingly, "[w]henever one unlawfully intercepts such a communication, it is

inadmissible in any court proceeding." *Id.* *See* CJP § 10-405 ("no part of the contents of the communication . . . may be received in evidence in any trial").

Because "[a] communication that is intercepted unlawfully under the Wiretap Act may not be received in evidence at trial[,]" we conduct a *de novo* review to determine whether the trial court was legally correct in its interpretation of that law. *Boston*, 235 Md. App. at 145. *See Seal*, 447 Md. at 70. In doing so, "[w]e give no deference . . . to the question of whether, based on the facts, the trial court's decision was in accordance with the law." *Seal*, 447 Md. at 70.

## B. Appellant's Challenges

Appellant argues that that the trial court erred in excluding Ashley B.'s recording of her conversation with B.B. because that recording "was outside the reach of Maryland's wiretap statute." In support, appellant maintains that (1) the statute does not apply to a parent's surreptitious audio recording of a private conversation with her child, using a standard app on a cell phone; (2) even if the wiretap act applies to a parent's recording of her child, the recording by Ashley B. is admissible under the doctrine of vicarious consent; (3) exclusion was an unwarranted and excessive remedy for any violation of the wiretap act; and (4) the recording is otherwise admissible as impeachment evidence under Md. Rule 5-806. We shall address – and reject – each of appellant's contentions in turn.

## 1. Scope of Maryland Wiretap Act

Appellant argues that "[n]othing suggests that the General Assembly intended to preclude the type of recording at issue here, concluding otherwise would lead to absurd results, and any ambiguity must be resolved in [his] favor." In his view, "it is absurd to

10

contend that the General Assembly intended for the wiretap statute to cover recordings made by a parent of her child within the privacy of their home."

When interpreting the Maryland Wiretap Act, our

> goal is "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied." We must begin with the well-established canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. If the language is clear and unambiguous on its face, that is the end of our inquiry. If, however, the language is ambiguous, we move on to examine case law, the structure of the statute, statutory purpose, and legislative history to aid us in ascertaining the intent of the General Assembly. Additionally, statutes "should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory."

*Seal*, 447 Md. at 70-71 (citations omitted).

Subject to exceptions not pertinent here, CJP § 10-402(a)(1) makes it "unlawful for any person to . . . [w]illfully intercept . . . any . . . oral . . . communication[.]" Appellant tacitly concedes that the conversation between Ashley B. and her daughter qualifies as an oral communication but contends that the recording itself was not an unlawful *interception* because of the *electronic device* used to make it. Specifically, appellant relies on the definition of "intercept" as "the aural or other acquisition of the contents of any . . . oral communication **through the use of any electronic, mechanical, or other device**[,]" CJP § 10-401(10) (emphasis added), which in turn is defined as

> **any device or electronic communication other than:**
>
> **Any telephone** or telegraph instrument, equipment or other facility for the transmission of electronic communications, or any component thereof,
> (a)     furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and **being used by the subscriber or user in the ordinary course of its business** or furnished by the subscriber or user for connection to the facilities of the service and used in the ordinary course of its business[.]

11

CJP § 10-401(8)(i) (emphasis added). In appellant's view, "[i]t is difficult to conceive of how Ms. B.'s use of a pre-installed 'app' on her cell phone, to record a conversation with her daughter in the privacy of their home, is anything other than 'ordinary' use of the device."

We disagree. To the contrary, we find it difficult to conceive how the use of a cell phone by a private citizen to secretly record a face-to-face oral conversation without the consent of all participants is anything other than a presumptive violation of Maryland's wiretap law.

The "ordinary course" language that appellant has "cherry-picked" out of the definition of "electronic, mechanical, or other device" does not apply in this scenario. This is the so-called "extension line" exemption that is designed to ensure that recording on a "landline" phone "in the ordinary course of business," from an extension phone, does not qualify as interception of an oral communication. *See generally Adams v. State*, 289 Md. 221, 227-29 (1981) (holding that a telephone extension is not an "electronic, mechanical, or other device" when used to intercept oral communications). Using a recording app installed on a cellular phone to record a face-to-face personal conversation is not using the *telephone* function of the device in "the ordinary course of business," as contemplated by this exclusion.

The ease and popularity of cell phone recordings does not suspend the protections afforded by the statute. The clear purpose of the Maryland Wiretap Act is to prohibit secret recordings of private oral communications, without regard to which device may be used to accomplish that task. To be sure, this provision of Maryland's wiretap law was enacted

12

long before it was technologically possible to record private conversations with equipment as omnipresent, multifunctional, and compact as the modern cell phone. Yet we see nothing in the language or purpose of the statute to distinguish secret recordings made with the devices of yesteryear from those made with today's smart phones.

Nor do we find any basis to distinguish between recordings made at home and those made elsewhere. Appellant cites nothing in the text, history, or purpose of the statute to suggest that it has such geographic limits.

Moreover, we are not persuaded by appellant's claim that failing to exempt parental recordings "would lead to absurd consequences." Appellant posits that

> [i]f Ms. B.'s recording of B.B. is the type of recording that falls under the scope of the wiretap statute, then so too does a parent recording a child opening presents during the holiday season, a child playing with friends during a birthday party, a child uttering her first words, and myriad other circumstances. Adding to the absurdity is the fact that . . . parents who make such recordings would be criminally liable under § 10-402(b). Nothing indicates that the General Assembly intended for such extraordinary consequences.

The recording made by Ashley B. was a secret measure intentionally undertaken to capture B.B.'s statements about her report of sexual abuse. Ashley B.'s deliberate concealment of the recording and the intimate nature of the conversation materially distinguishes this recording from the birthday party and comparable scenarios cited by appellant. In each of those circumstances, children are likely to be aware of the recording, so that they fairly may be understood to tacitly consent to it. Moreover, a video recording without audio or without oral communication is not prohibited under the wiretap statute. *See, e.g.*, *Deibler*, 365 Md. at 200 ("a video surveillance, though in many respects a greater

13

intrusion on privacy than an audio surveillance, was not prohibited by § 10–402"); *Ricks v. State*, 312 Md. 11, 20 (1988) ("there is nothing in either [the federal or Maryland Wiretap] Act, express or implied, which prohibits or in any way undertakes to regulate video surveillance").

We found no Maryland precedent applying CJP § 10-402(a) to a recording secretly made by a parent during a face-to-face conversation with her child. Nevertheless, this Court rejected an analogous argument seeking an exemption for surreptitious telephone recordings of one spouse by another. In *Standiford v. Standiford*, 89 Md. App. 326 (1991), we explained, in language we find equally appropriate to the parent-child recording at issue in this case, that

> the statutory language is clear and, therefore, it is unnecessary to examine the legislative history for interpretation. The Maryland statute clearly and unambiguously prohibits all willful interceptions and endeavors to intercept any wire, oral or electronic communication. There is no explicit exception regarding the interception of a spouse's communication.

*Id*. at 335.

To the extent appellant seeks to narrow the broad reach of the wiretap statute by substituting policy arguments for the plain meaning of its language, his arguments should be directed to the legislature rather than the courts.[1] "[I]t is within the legislative wisdom to carve out an exception in the law where the General Assembly did not believe the law

---

[1] Similarly, whatever policy arguments may be made against holding parents criminally responsible for pushing the record button on their cell phones, the issue here is the exclusion of this recording, not prosecution of the recorder. We leave the task of enforcing the statute to the State's Attorney and the task of establishing the law to the General Assembly.

14

should operate." *Adams*, 289 Md. at 228. As we pointed out in rejecting a judicially-created exception for spousal communications, "[h]ad the General Assembly intended an exception for the interception of [such] communications . . . , it would have specifically provided one, as it did with respect to the use of extension telephones." *Standiford*, 89 Md. App. at 337.

For these reasons, we agree with the trial court and the State that the statutory prohibition against surreptitious interception of private conversations applies to Ashley B.'s cell phone recording. Indeed, a contrary construction of the statute would effectively gut its core "declaration of . . . public policy" that "'a party to a . . . conversation does *not* take the risk that another party, not acting as, or under the direction of, a government agent, will record and divulge the contents of the conversation.'" *See Seal*, 447 Md. at 73-74 (quoting *Perry v. State*, 357 Md. 37, 61 (1999)). We hold that the trial court did not err in determining that Ashley B.'s recording is inadmissible under CJP §§ 10-402(a) and 10-405.

### 2. Vicarious Consent Doctrine

Seeking an alternative ground for admitting the recording, appellant invokes the judicially-created doctrine of vicarious consent, under which a parent may be deemed to have consented to a recording on behalf of his or her child, without the child's knowledge or consent, if the parent "has a good faith, objectively reasonable basis for believing that it is necessary and in the best interest of the child to consent on behalf of his or her minor child[.]" *Pollock v. Pollock*, 154 F.3d 601, 610 (6th Cir. 1998). *See generally In re Trever P.*, 14 Cal. App. 5th 486, 496-501 (Cal. Ct. App. 2017), *review denied* (Nov. 15, 2017)

(surveying judicial development of doctrine); Daniel R. Dinger, *Should Parents Be Allowed to Record a Child's Telephone Conversations When They Believe the Child Is in Danger?: An Examination of the Federal Wiretap Statute and the Doctrine of Vicarious Consent in the Context of a Criminal Prosecution*, 28 Seattle U. L. Rev. 955, 968-87 (Summer 2005) (collecting and analyzing cases).  As appellant observes, this vicarious consent doctrine, in theory, could provide some protection for "the fundamental constitutional rights" of a parent "in raising his or her children as he or she sees fit, without undue interference by the State." *In re Yve S.*, 373 Md. 551, 565 (2003).

Yet appellant acknowledges that no Maryland court has adopted the vicarious consent doctrine and that its application under our statute would necessarily be limited. Although most courts applying the vicarious consent doctrine have done so under a statute that requires the consent of only one party to the recorded communication,[2] Maryland

---

[2] For a recent and thorough review of federal and state jurisdictions that have adopted some version of the vicarious consent doctrine, see *In re Trever P.*, 14 Cal. App. 5th 486, 496-501 (Cal. Ct. App. 2017), *review denied* (Nov. 15, 2017).  In adopting the doctrine under its one-party consent wiretap statute, the California appellate court shared the following research:

> *Pollock* appears to be the only federal appellate decision on the issue. Some district courts in the Eighth and Tenth Circuits have followed *Thompson* and *Pollock*. (*Babb v. Eagleton* (N.D. Okla. 2007) 616 F.Supp.2d 1195, 1205-1206; *Wagner v. Wagner* (D. Minn. 1999) 64 F.Supp.2d 895, 899-901; *Campbell v. Price* (E.D. Ark. 1998) 2 F.Supp.2d 1186, 1189.)  We have found no other federal cases deciding the issue, and thus none rejecting the doctrine.

(continued)

requires consent from all parties to the communication, meaning that the doctrine could

not be applied to any conversation involving a third party other than the consenting parent

and his or her child. *See generally* Dinger, *supra*, 28 Seattle U. L. Rev. at 967 ("As it has

developed, the vicarious consent doctrine is available only in those jurisdictions that enact

one-party consent exceptions.").

Appellant nevertheless contends that the trial court erred in failing to admit Ashley

B.'s recording under such a vicarious consent theory, arguing that

> the facts of this case warrant applying the vicarious consent doctrine in
> Maryland. Unlike the typical vicarious consent case, which involves a parent
> and/or police surreptitiously recording his or her child speaking with a third
> party, *see* Dinger at 968-79, this case involves a parent recording her own
> conversation with her child in the privacy of her home. This is exactly the
> type of situation where parents should be allowed to consent on behalf of

---

(continued)

> Five state supreme courts have adopted the doctrine for purposes of
> state anti-interception statutes, in each instance finding a parent could
> consent vicariously despite the lack of an express parental consent provision
> in the statute. (*People v. Badalamenti* (2016) 27 N.Y.3d 423, 54 N.E.3d 32,
> 37-40 (*Badalamenti*); *Griffin v. Griffin* (Me. 2014) 92 A.3d 1144, 1152;
> *Commonwealth v. F.W.* (2013) 465 Mass. 1, 986 N.E.2d 868, 873-875
> [adopting doctrine and extending it to adult sibling of child victim]; *State v.
> Whitner* (2012) 399 S.C. 547, 732 S.E.2d 861, 864-865; *State v. Spencer*
> (Iowa 2007) 737 N.W.2d 124, 133-134 (*Spencer*).) Intermediate appellate
> courts in several other states have done the same. (*Lawrence v. Lawrence*
> (Tenn. App. 2010) 360 S.W.3d 416, 418-420; *Alameda v. State* (Tex. Crim.
> App. 2007) 235 S.W.3d 218, 221-223; *Smith v. Smith* (La. App. 2005) 923
> So.2d 732, 740; *State v. Morrison* (Ariz. App. 2002) 203 Ariz. 489, 56 P.3d
> 63, 65; *In re Marriage of Radae* (1991) 208 Ill.App.3d 1027, 153 Ill. Dec.
> 802, 567 N.E.2d 760, 763-764; *State v. Diaz* (N.J. App. 1998) 308 N.J. Super.
> 504, 706 A.2d 264, 269-270; *Silas v. Silas* (Ala. Civ. App. 1996) 680 So.2d
> 368, 370-372.)

*Id*. at 498.

17

their children, or, at the very least, where it should be presumed parents are acting in their children's best interests. Viewed in this way, being able to consent to a recording of a child is comparable to other situations where parents may consent on behalf of their minor children. *In re Yve S.*, 373 Md. [at 566] (summarizing various circumstances where parents may make decisions on behalf of their children). To hold otherwise would allow the government to infringe on the constitutional rights of parents.

After hearing argument and reviewing case law, the trial court asked defense counsel for his "representation of why Ms. [B.] was making this recording[.]" Defense counsel proffered as follows:

> Ms. [B.], in our personal interviews with Ms. [B.] we asked that very question and Ms. [B.] said that her concern was that if, if [B.B.] had lied then that meant that a person who was harming her may still be out there. That if a person who had been touching her inappropriately, if she lied about Roy, as [B.B.] calls him. If she lied about . . . Mr. Holmes, then Ashley was concerned that whoever actually was touching her might still be able to do it if everyone was focusing on Roy and that [B.B] was now sort of stuck with that story because she told it to police. And so she was concerned about [B.B.].

> She also was concerned . . . because of the nature of the way that . . . the statement came about to Pam and Alandria and Eboni that . . . it was harmful to [B.B.] . . . if people in her family were sort of putting ideas in her head, then that would also be harmful to her because it would . . . harm her relationship with the only father she's even known was Mr. Holmes. And she was concerned that would be psychologically damaging to [B.B.]. And also that she was concerned that if [B.B.] had guilt over . . . being untruthful in her statements that that would also be psychologically damaging. So, she was concerned for her child's welfare and that's why she recorded the statement.

In response, the prosecutor proffered that appellant's jail calls with Ashley B. indicated that she did not make the recording to protect her child:

> Your Honor, we have listened to hundreds and hundreds of jail calls between the defendant and Ms. Ashley [B.]. Many of those calls in the beginning were about this recording. **She stated basically that she, pretty much, was recording her because she thought that this was made up**.

18

She says, maybe she was dreaming.  The defendant says about 8,000 times, I think she was dreaming.  I think she had a wet dream and then basically the aunts filled in the blanks.  Never once does she ever posture that there may be another random person out there that assaulted her.

In fact, she says pretty much the exact opposite.  That [B.B.] was fine.  That there was no issue.  That if anyone had assaulted her there would have been physical signs of injury.  She, she in fact, literally, said the opposite.  She could not have been less concerned with her daughter.  Which, by the way, is why Child Protective Services took her away.  I mean it's incredibly disingenuous to stand before the Court and say that those actions of surreptitiously recording her child were there for protection.  I mean there's no possibility of that.

(Emphasis added.)

The trial court concluded that even assuming *arguendo* that the doctrine of vicarious consent may be available under the Maryland Wiretap Act, it would not apply to Ashley B.'s recording, explaining:

I think the more pertinent argument is, that the parent may have or could theoretically have vicariously consented to the tape recording such that there would be two party consent.  A parent and a child.  So that that exception to the wiretap statute would be met.  It seems to me that, first of all there is no, there really is not a lot of law, specifically in Maryland about this.  I think there is some federal law from other places.  There's one case that the defense has cited, I believe called *Campbell* and *Price* from Arkansas, which is the defense[']s papers.  There's another case, *Pollock* and *Pollock* from the 6th Circuit.

Both of these cases envision that a parent, in some circumstances, could consent vicariously or their vicarious consent could be applicable for taping under the federal statutes.  You know, assuming that it is appropriate to graft onto the State statute the exceptions, so to speak, that apply to the federal statute, which is an issue that I don't decide because . . . I assume for the sake of argument that that exception might be applicable in Maryland.  What that exception tells us is that (unintelligible) a parent's good faith concern for the minor child's best interest may be a reason for vicariously consenting.

19

**I asked the question today, why she had recorded it? And the parties offered me, by way of proffer, evidence about that and based on that evidence, as well as . . . what I heard from the Detective, I'm not satisfied, in this case that Ms. [B.] was acting in the child's best interest.** And the reason is as follows: We heard from the Detective that [t]he mother was belligerent when the search warrant was being executed. Which seems to me that, it suggests that . . . her interests are somewhat adverse to the child, even immediately. But then, after the fact, we have argument from both sides, proffer from both sides and you know the defense is proffering that she was doing it for the child's safety. The State is proffering that there were many calls from the jail between the defendant and Ms. [B.] That none of those safety concerns were merited or warranted or safety concerns were brought up.

I have to say that **in light of the Detective's testimony, I find that the State's proffer is more persuasive to me about what Ms. [B's] intent was and I have to say that based on that I accept the State's proffer on that.** And so having accepted the State's proffer and the veracity of the State's proffer, it precludes me from finding that Ms. [B] was acting in the child's best interest in tape recording this. And so, for that reason, even if the exception that applies in the federal statute would apply in Maryland, I don't think it's been met here. And so, I'm not going to allow the tape to come into evidence for that reason.

(Emphasis added.)

In appellant's view, the trial court's analysis was "flawed" because it impermissibly rested "solely on [the court's] evaluation of *proffers* by the respective parties[,]" without considering any "actual evidence." In support, appellant cites *Dorsey v. State*, 356 Md. 324, 355 (1999),[3] reversing a criminal contempt conviction premised on "absolutely no evidence," because the court relied on unsworn statements and documents that, even had they been admitted as evidence, were insufficient to find the defendant guilty. Appellant

---

[3] Although appellant cites the Court of Appeals decision in these consolidated appeals as *Craft v. State*, we shall refer to that opinion in its official "bluebook" form, by the name of its primary appellant, Paul Dorsey.

acknowledges that the *Dorsey* Court did not resolve whether the defendant waived his right to complain by making the proffer relied on by the trial court and failing to object to the lack of evidence. *Id.* According to appellant, however, defense counsel's lack of objection in this case poses "no waiver problem" "because the court on its own elicited proffers from the defense[,]" which equates to proceeding "on absolutely no evidence[,]" as in *Dorsey*.

Appellant mischaracterizes and misunderstands the trial court's decision. As a threshold matter, the excerpted transcript establishes that the court's ruling was not premised solely on proffers. To the contrary, the court twice stated that it was relying on the testimony of Detective Diaz, who testified under oath in the State's case-in-chief, then was re-called by the defense and voir dired without the jury present regarding matters relevant to the State's motions to exclude both the cell phone recording and DNA test results (see *infra* Part II). In ruling on the admissibility of the recording, the court was entitled to consider and credit Detective Diaz's testimony that after appellant was arrested, when police returned a second time to the apartment to execute a search warrant, "Ashley [B.] became uncooperative" and "was yelling out belligerent things[.]". *See* Md. Rule 5-104(a).

Likewise, the court also was entitled to consider and credit the proffers by counsel. *Id.* In contrast to *Dorsey*, where the trial court convicted the defendant based solely on proffers, here the court merely decided whether evidence was admissible based in part on proffers. As we have explained, the court may make such an admissibility determination on the basis of proffered evidence. *See Crane v. Dunn*, 382 Md. 83, 92 (2004). Indeed,

21

Rule 5-104(a) expressly authorizes the court to determine whether such evidence is admissible without strictly applying the rules of evidence.

In these circumstances, moreover, appellant cannot complain that the court relied on evidentiary proffers. By the time the trial court decided the State's motion to exclude Ashley B.'s recording, the State had rested its case and Detective Diaz had been voir dired outside the presence of the jury. After making his proffer regarding why Ashley B. recorded her conversation with B.B., and listening to the State's proffer regarding Ms. B.'s statements pertaining to that recording, defense counsel did not request an opportunity to present additional evidence before the court ruled on the State's motion in limine. Nor did he object to the court determining admissibility on the basis of that record. In the absence of any objection or request to present additional evidence, the trial court did not err or abuse its discretion in premising its decision to exclude the recording on both the evidence elicited from the detective and the proffers made by counsel.

We also find no merit in appellant's corollary complaint that the court impermissibly resolved "dueling proffers" that presented a credibility dispute. Citing *Taylor v. State*, 388 Md. 385, 398 (2005), holding that "the procedure of having all of the evidence presented through stipulation" may not be used "when there are material disputes of fact that hinge on credibility determinations," appellant argues that it was error to credit one proffer over the other because "the parties adamantly disagreed about Ms. B.'s motive[.]" Yet none of the facts proffered by defense counsel as to what Ashley B. told appellant's attorneys about her conversation with B.B. were necessarily inconsistent with

22

the facts proffered by the State as to what Ashley B. said to appellant during their phone conversations.

According to the State's proffer, when discussing the recording with appellant shortly after it was made, Ashley B. voiced no concern that B.B. had been abused by someone else and reported that her daughter was "fine." Moreover, Ms. B. expressed concern that B.B. had been influenced by her relatives, who had "filled in the blanks" of the child's "wet dream." She also told appellant that she recorded her conversation with B.B. "because she thought that this was made up."

According to the defense proffer, Ashley B. reported to appellant's lawyers that she was concerned that her daughter may have been abused by someone else, that the child may have been influenced by relatives, and that B.B. might be feeling trapped into her story or guilty for accusing the only father she had ever known. Nothing in that defense proffer was incompatible with the State's proffer or the detective's testimony. Indeed, it is entirely plausible that Ashley B. expressed her concerns differently to appellant than she did to his lawyers.

The issue before the trial court was not whether to believe one set of proffered facts over the other, but to decide whether, viewing all of those proffered facts in light of Detective Diaz's testimony, the defense satisfied its burden of establishing by a preponderance of the evidence that Ashley B. recorded her conversation with B.B. in a good faith effort to protect her daughter, and not for any other purpose, such as collecting evidence to use in appellant's defense. *See generally Boston*, 235 Md. App. at 151 ("as the

23

proponent of the motion [to exclude the recording] it was [appellant's] burden to produce evidence to show that the Wiretap Act was violated and to persuade the court to so rule").

As the trial court recognized, the critical difference between the two proffers was in what they revealed about whether Ashley B. secretly recorded her conversation with B.B. to protect the child or whether she did so to protect appellant. According to the State's proffer, Ashley B. discussed the recording during her many calls with appellant and "stated basically that she, pretty much, was recording her because she thought that this was made up." When defense counsel proffered that Ashley B. was concerned about B.B.'s psychological welfare, that information merely explained why she had this conversation with B.B. Nothing in appellant's proffer explained why, in addition to discussing the incident with her daughter, Ashley B. felt it was necessary to record their face-to-face, one-on-one conversation.

Unlike most cases that have addressed the vicarious consent doctrine, the reason for Ashley B.'s recording is not readily apparent from the circumstances in which it occurred. Indeed, this case differs materially from the typical vicarious consent cases arising in one-party consent jurisdictions. Many of those cases involve a custodial parent who recorded his or her child's telephone conversation with a third party (often the non-custodial parent), citing concern for the child's physical or emotional welfare. *See* footnote 2, *supra* (collecting cases). In such cases, the recording parent did not record her own face-to-face, one-on-one conversation with the child after the child's report of abuse. To the contrary, in most vicarious consent cases, the recording parent did not participate in the recorded conversation – and that is why he or she recorded it. The purpose of such recordings

24

typically is to listen in on the child's telephone conversation with another person, in order to investigate whether that person is abusing the child. None of these circumstances were present in this case.

In our view, the trial court did not reject the defense proffer as untrue or make credibility determinations. As the court explained, it simply found "in light of the Detective's testimony, . . . that the State's proffer is **more persuasive to me about what Ms. [B.'s] intent** was" and "precludes me from finding that Ms. [B.] was acting in the child's best interest in tape recording this." (emphasis added). Based on this ruling, we are satisfied that the court determined that appellant failed to satisfy his burden of establishing a factual and legal basis for his vicarious consent claim. Specifically, the court concluded that the defense did not establish, by a preponderance of the evidence that was given under oath and by proffer, that Ashley B. recorded the conversation to protect her daughter, rather than to protect appellant. In turn, the court did not err or abuse its discretion in declining to apply the doctrine of vicarious consent.

### 3. Exclusionary Rule

Appellant next asserts that "[e]ven if a wiretap violation occurred, the circuit court still erred in electing, as a remedy, to exclude the cell phone recording." Citing *Massachusetts v. Barboza*, 763 N.E.2d 547 (Mass. Ct. App. 2002), he argues that "[e]xcluding the cell phone recording in this case did nothing to deter illegal conduct by law enforcement because police did not help create the recording."

The Massachusetts wiretapping statute applied in *Barboza* makes that case inapposite because that statute does not include a mandatory exclusion provision

comparable to CJP § 10-405. *See id.* at 551 (although "the Massachusetts wiretap statute … strictly prohibits the secret electronic recording by a private individual of any oral communication[,] ... the statute does not mandate that all unlawfully intercepted communications should be suppressed.")(citations and quotation marks omitted). In contrast, because § 10-405 unequivocally states that an unlawful recording may not be admitted at trial, the trial court did not err or abuse its discretion in excluding Ashley's B.'s recording.

### 4. Admissibility Under Md. Rule 5-806

Appellant mistakenly relies on Md. Rule 5-806, which creates an impeachment exception to the rule against hearsay,[4] as an alternative ground for allowing defense counsel to use Ashley B.'s recording to impeach B.B.'s out-of-court statement. This exception is not available to appellant because the bar of § 10-405 extends to both substantive and impeachment uses. *See, e.g.*, *Sun Kin Chan v. State*, 78 Md. App. 287, 306 (1989) (Maryland wiretap statute "totally prohibits . . . the use of illegally obtained communications as either substantive or impeachment evidence").

---

[4] Md. Rule 5-806(a) provides:

When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if the declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

26

## II.    Restriction on Defense Examination of Detective Diaz

Appellant next contends that the trial court "erred in hindering the defense from exploring the fact that police did not conduct any follow-up investigation after they learned that [appellant] was excluded as the source of semen found on B.B.'s bed sheet." Specifically, appellant challenges the trial court's decision to preclude defense counsel from questioning Detective Diaz about her investigation following receipt of what he contends were "exculpatory" DNA test results.  For the reasons that follow, we conclude that the trial court did not err or abuse its discretion in restricting the defense examination.

### A.  The Relevant Record

This issue arose after the State rested its case-in-chief without calling the author of a DNA test report, dated June 13, 2016, prepared by Bode Cellmark Forensic Laboratories. That report, which was attached to a memorandum received by Detective Diaz, revealed that DNA testing was done on bodily fluid found on a pink bed sheet recovered during a warrant search of appellant's apartment in February 2016, weeks after the incident of sexual contact reported by B.B.  The test results apparently exclude both appellant and B.B. as contributors to a sample suspected of containing seminal fluid.

Defense counsel, who did not subpoena the author of the report, was surprised and frustrated that the State would not be calling her as a witness, because counsel had planned to cross-examine the witness regarding what counsel viewed as critically exculpatory DNA test results.  When defense counsel recalled Detective Diaz as a defense witness, he proposed to ask about her response to the DNA report, in an effort to impeach the State's

27

investigation by suggesting there was no effort to follow up to determine whether B.B.'s abuser was someone else.

When the State objected that the inquiry was designed to elicit the inadmissible hearsay report, the trial court asked for a defense proffer as to the admissibility and relevance of Diaz's response. Defense counsel proffered that he "want[ed] to ask the detective . . . what, if any actions were taken," based on the DNA test report, including whether police "look[ed] at other suspects[,]" "ask[ed] for further testing on that DNA" or "ran it in Codis" in order "to determine race" and "narrow down a list of suspects[.]" Defense counsel argued that the contents of the report, if not the document itself, were admissible through Detective Diaz to show its effect on her investigation. The court then allowed defense counsel to question Detective Diaz outside the presence of the jury, in order to establish a foundation for the proposed inquiry.

After that voir dire was complete, the court agreed with the prosecutor that defense counsel was trying to get the inadmissible DNA test results into evidence through the "backdoor." Although the court permitted defense counsel to elicit from the detective that she was present when the bed sheet was recovered and that she ordered DNA testing on it in order to determine whether it incriminated appellant, counsel was precluded from asking questions that revealed the substance of the report or required the detective to explain her response to it.

### B. Standards Governing Restriction of Defense Examination

Under the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights, a criminal defendant has the right to present witnesses

and evidence to establish his defense. *See Taneja v. State*, 231 Md. App. 1, 10 (2016), *cert. denied*, 452 Md. 549 (2017). This right "is not absolute" because the "'accused does not have an unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence.'" *Id.* (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)). In particular, "'[t]he proffered evidence must be sufficiently relevant, rather than 'cast[ing] a bare suspicion upon another.'" *Id.* (quoting *Holmes v. South Carolina*, 547 U.S. 319, 323-24 (2006)). As this Court has explained,

> the right to present a defense, albeit fundamental, is nonetheless subject "to two paramount rules of evidence, embodied both in case law and in Maryland Rules 5-402 and 5-403. The first is that *evidence that is not relevant to a material issue is inadmissible*. The second is that, *even if relevant*, *evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury*."

*Id.* at 11 (quoting *Muhammad v. State*, 177 Md. App. 188, 274 (2007), and *Smith v. State*, 371 Md. 496, 504 (2002)).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. "Evidence that is not relevant is not admissible." Md. Rule 5-402. Even if the proffered evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5-403. We review a decision to exclude evidence on relevance grounds for abuse of discretion. *See Brooks v. State*, 439 Md. 698, 708-09 (2014).

29

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). Unless the out-of-court statement in question fits within an established exception to the rule against hearsay, it "is not admissible." Md. Rule 5-802. This Court determines *de novo* whether evidence constitutes inadmissible hearsay. *See Parker v. State*, 408 Md. 428, 436 (2009).

### C. Appellant's Challenge

Appellant argues that the trial court abused its discretion in restricting defense counsel's proposed inquiry about the detective's response to the DNA test results, because the inquiry "would not have elicited hearsay and would have been relevant to cast doubt on the thoroughness of the police investigation in this case." We disagree.

Our recent decision in *Taneja* is instructive. In that case, defense counsel requested permission to examine a witness, Mr. Singh, whom defense counsel sought to implicate in the murder for which his client was on trial. After conducting a preliminary hearing outside the presence of the jury, the trial court precluded defense counsel from calling Mr. Singh. This Court affirmed that ruling, emphasizing that "[t]he proffered evidence must be sufficiently relevant, rather than cast[ing] a bare suspicion upon another." *Taneja*, 231 Md. App. at 10 (citations and quotation marks omitted).

Here, as in *Taneja*, the trial court did not err or abuse its discretion in foreclosing defense counsel's persistent attempts to "cast a bare suspicion upon another." *See id*. By the time this issue arose, the court had heard evidence that B.B., who lived with appellant and had no trouble recognizing him, reported that he touched her vagina while she lay in

30

her bed. She did not describe anything that might indicate that he ejaculated or emitted seminal fluid on her bedsheet during that incident. Moreover, the incident occurred during Christmas week, but the sheet was not recovered until weeks later, after B.B. talked to police on February 14, 2016.

Based on this record, neither the absence of appellant's DNA on the sheet six weeks after the incident, nor the possible presence of someone else's DNA, made it significantly more likely that someone other than appellant abused B.B. In turn, because the DNA results did not exonerate appellant, Detective Diaz's response to those results was marginally relevant at best. In focusing on the detective's response to such equivocal information, defense counsel's proposed line of inquiry was also confusing to the jury.

In these circumstances, we reach the same conclusion as in *Taneja*, that the excluded

> evidence would have been, at best, only tangentially relevant and had a high probability of confusing, distracting, and misleading the jury. We are mindful that evidentiary questions are left to the sound discretion of the trial court, and are not to be disturbed—even if we were inclined to rule differently—absent a clear abuse of discretion. In sum, the evidence [defense counsel] sought to introduce through Singh was disconnected and remote. It had no other effect than to raise the barest of suspicion that Singh might have killed [the victim].

*Taneja*, 231 Md. App. at 18.

On this record, we are satisfied that the trial court did not err or abuse its discretion in restricting the defense examination on this point. The court resisted defense efforts to get the hearsay DNA test results into evidence, first as impeachment evidence, and then through the proverbial "backdoor" by questioning Detective Diaz about them. Although the trial court allowed defense counsel to question the detective about her investigation, it

31

refused to allow questions about how she responded to those test results, because that line of questioning sought marginally relevant evidence that would have confused the jury, by suggesting that the mystery DNA contributor committed the crime for which appellant was on trial. *See* Md. Rule 5-403; *Taneja*, 231 Md. App. at 18.

### III. Restrictions on Defense Examination of Other Witnesses

In his final assignment of error, appellant challenges rulings that restricted defense counsel's examination of three other witnesses, arguing that these limitations collectively excluded relevant evidence and therefore constituted reversible error. We address each challenge in turn, explaining why none merits reversal.

### A. Limitations on Cross-Examination of B.B.

Pointing out that "whether or not [appellant] got along with B.B.'s aunts had a bearing on whether the aunts had an independent reason to 'have it out for'" him, appellant argues that the trial court abused its discretion in sustaining the State's objection when defense counsel asked B.B. whether she had "discussed with Aunt Langie 'what was going to happen today here in Court.'" In appellant's view, B.B.'s answer was relevant and admissible because it "had a bearing on witness credibility" given that "a response of 'yes' would have helped the defense raise the possibility that Aunt Langie influenced B.B.'s testimony or made sure her own testimony matched B.B.'s testimony."

A criminal defendant's right to cross-examine a prosecution witness is guaranteed by the Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, and Article 21 of the Maryland Declaration of Rights. *See Martinez v. State*, 416 Md. 418, 428 (2010). As the Court of Appeals has explained,

"[t]he right of confrontation includes the opportunity to cross-examine witnesses about matters relating to their biases, interests, or motives to testify falsely." That principle is incorporated in Maryland Rule 5–616(a)(4), which provides that "The credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at: . . . Proving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely." To comply with the Confrontation Clause, a trial court must allow a defendant a "threshold level of inquiry" that "expose[s] to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witnesses."

*Peterson v. State*, 444 Md. 105, 121-23 (2015) (citations omitted).

That standard was satisfied here. Defense counsel was permitted to ask B.B. whether she "g[o]t to talk to [Alandria] about what you were going to do today here in Court[,]" to which B.B. responded, "Yes." Subsequent questions prompted objections that were properly sustained, as follows:

[DEFENSE COUNSEL]: Did [Alandria] tell you anything about what you should do today?

[PROSECUTOR]: Objection, hearsay. . . .

**THE COURT: Sustained.**

[DEFENSE COUNSEL]: Did you have a discussion with Aunt – without telling me what she said, don't say that, but did you have a conversation with your Aunt Langie about what was going to happen today here in Court?

[PROSECUTOR]: Objection.

**THE COURT: Sustained.**

[DEFENSE COUNSEL]: Did you talk to Aunt Langie today?

[B.B.]: Yes.

[DEFENSE COUNSEL]: Okay. She came by Pam's house, your grandma's house?

[B.B.]:  Yes, she did.

(Emphasis added.)

The court's initial ruling was correct because defense counsel's question invited hearsay (i.e., an out-of-court statement regarding what Alandria told B.B. she should do at trial).  *See* Md. Rule 5-801, 5-802.  The second ruling was within the court's discretion because the question repeated the same inquiry and B.B. had already testified that she talked with Alandria about testifying.  *See* Md. Rule 5-403.

Appellant also challenges the trial court's subsequent ruling sustaining the State's objection when defense counsel asked B.B.:  "So I would be right if I said that [appellant] and your aunts don't get along, would I be right?"  This question was patently rhetorical, given that it was asked immediately after the child testified that appellant got into a "yelling" argument with her aunts at a family Christmas party, as a result of telling B.B. that he would "drop kick" a piece of cake out of her hand.  Moreover, defense counsel had ample opportunity to question B.B.'s Aunt Alandria and Aunt Eboni, as well as their sister (B.B.'s grandmother, Pam Walters) and appellant himself.  In these circumstances, appellant was afforded his right of confrontation on this issue.

### B.  Limitation on Direct Examination of Ashley B.

Appellant next maintains that the trial court erred when it restricted defense counsel from asking Ashley B. on direct whether she "did" or said "anything to [B.B.] to encourage her to make these statements" alleging abuse.  Appellant argues that "whether or not [Ashley] B. did anything to influence B.B.'s statements during the recorded conversation obviously speaks to the legitimacy of those statements."

34

The record does not support appellant's complaint. To the contrary, it establishes that defense counsel was permitted to elicit Ashley B.'s testimony that she did not influence B.B.'s report, as follows:

[DEFENSE COUNSEL]: Did she ask you if she'd go to jail if she lied?

[ASHLEY B.]: Yes.

[DEFENSE COUNSEL]: Okay, and what was your response to that question?

[ASHLEY B.]: I told her I'm not sure what would happen.

**[DEFENSE COUNSEL]: Okay. Did you, in the course of that conversation, ever try to encourage her to make these statements?**

**[ASHLEY B.]: No.**

(Emphasis added.)

It was only when defense counsel repeated the same question that the trial court sustained the State's objection. A court may reasonably exercise its discretion to exclude cumulative evidence. *See* Md. Rule 5-403. Because that is what happened here, the trial court did not err or abuse its discretion in sustaining the State's objection.

### C. Limitations on Re-direct Examination of Appellant

Appellant's final challenge stems from his re-direct examination, when the trial court sustained the State's objections after defense counsel asked appellant whether he "was surprised when the detective informed him of the charges." Appellant contends this was error because appellant's responses "would have provided the jury with more information to gauge his overall credibility."

35

Appellant ignores that by that point in the trial, he already had been given an opportunity to express such surprise. On cross-examination, he testified:

[PROSECUTOR]: You remember telling Detective Diaz, regarding the allegations in this case, that [B.B.] must have been dreaming?

[APPELLANT]: Yes, along with, I had – I didn't know.

[PROSECUTOR]: Along with you didn't know?

**[APPELLANT]: Yeah, it was a big shock to me.**

(Emphasis added.)

On re-direct, appellant confirmed that he did not know why he was arrested until Detective Diaz interviewed him. At that point, defense counsel again attempted to elicit appellant's surprise, leading to the challenged rulings, as follows:

[DEFENSE COUNSEL]: Well, what was your reaction to that?

[APPELLANT]: It's – I couldn't even – I think about it sometimes and I get, you know, I get that feeling –

[PROSECUTOR]: Objection.

**THE COURT: Sustained.**

[DEFENSE COUNSEL]: Okay. When Detective Diaz finally told you, did that take you by surprise?

[PROSECUTOR]: Objection.

**THE COURT: Sustained.**

[DEFENSE COUNSEL]: Okay. Were you upset when you –

[PROSECUTOR]: Objection.

[DEFENSE COUNSEL]: -- when you were informed of the –

**THE COURT: Sustained.**

36

[DEFENSE COUNSEL]:  Your Honor, may we approach?

THE COURT:  No.  The objection is sustained.

(Emphasis added.)

We are not persuaded that the trial court deprived appellant of his right to "bolster his credibility" by foreclosing evidence about his "surprised" reaction.  At this stage in the trial, the jury had already heard that appellant was surprised when he was charged with sexually abusing B.B.  The court reasonably exercised its discretion to prevent defense counsel from asking repetitive questions that solicited cumulative evidence and needlessly prolonged appellant's testimony.  *See* Md. Rule 5-403.

## CONCLUSION

Because the trial court did not err or abuse its discretion in the rulings challenged by appellant, we shall affirm his convictions.

**JUDGMENTS AFFIRMED.  COSTS TO BE PAID BY APPELLANT.**